UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MARSHA D. FRANKLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-1820-JDT-TAB |
| | ) | |
| MICHAEL J. ASTRUE | ) | |
| Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY REVIEWING COMMISSIONER'S DECISION[1]

Marsha D. Franklin appeals the decision of the Social Security Commissioner

denying her Disability Insurance Benefits.  The court held oral argument on February

14, 2007, by telephone.  The court finds as follows.

## I.  BACKGROUND

This appeal of the SSA's denial of benefits arises from Mrs. Franklin's claim that

her back problems have caused her to become disabled because of incapacitating pain

and memory problems resulting from her pain medications.  (R.  682.)  Mrs. Franklin

first applied for Disability Insurance Benefits on May 7, 2002.  (R. 669.)

---

[1]  This Entry is a matter of public record and will be made available on the court's web
site.  However, the discussion contained herein is not sufficiently novel to justify commercial
publication.
   Michael J. Astrue became Commissioner of Social Security on February 12, 2007.
Pursuant to Federal Rule of Civil Procedure 25(d)(1), the court **orders** that he be substituted for
former Commissioner Jo Anne B. Barnhart as the defendant in this suit.

## A.  General Information

According to Mrs. Franklin, her back first began bothering her, whether from injury or some other reason, on December 3, 1996.  (R. 117.)  She was treated for her back problems and her symptoms improved until a June 2000 car accident reinjured or aggravated her back problems.  (R. 462.)  She stopped working March 7, 2001.  (R. 117.)

The SSA denied her initial application for benefits on July 25, 2002 (R. 676) and her request for reconsideration on January 21, 2003 (R. 672).  Mrs. Franklin filed her appeal with the agency, which held a hearing on May 19, 2004, before Administrative Law Judge ("ALJ") James R. Norris.  (R.  46.)  He issued his decision on December 10, 2004, and the Appeals Council denied her request for review on October 5, 2005, at which time the ALJ's decision became the final decision of the Commissioner.  (R. 13.)

At the time of the hearing, Mrs. Franklin was fifty-one years old, married, and living in Bainbridge, Indiana, a small community about 35 miles west of Indianapolis, Indiana.  (R. 116.)  From 1979 until 1989, she worked as a secretary, sales person and then office manager for a fencing company.  (R. 118.)  At that time, she completed classes to become a medical assistant.  (R. 123.)  She then worked as a medical assistant and office manager for an Indianapolis physician until she stopped working in 2001.  (R. 59, 101.)

At the time of her application, Mrs. Franklin reported that she was able to perform household chores and drive a car, but only for fifteen to twenty minutes at time.  (R. 99,

2

102.)  She said that she would then have to rest for fifteen minutes, or stand and walk for five to ten minutes after driving, before continuing.  (R. 102.)  Her husband  helps her bathe.  (*Id.*)  She reported that she is unable to lift anything heavier than a gallon of milk, and that she is never completely free of pain.  (*Id.*)

### B.  Medical Records

A substantial medical record has been accumulated regarding Mrs. Franklin's complaints of back pain, intestinal problems, fainting and other medical issues.  Most of the medical history stems from late 2000 until her hearing in May 2004.  During this time, she repeatedly sought treatment for a variety of complaints.  In most instances, with the exception of her back problems, her physicians failed to uncover a physical cause for her reported symptoms.  At least two doctors indicated that stress or depression may have caused or contributed to her physical ailments.  (*See, e.g.*, 229-30, 583.)

During this period, Mrs. Franklin was also taking multiple medications to relieve pain, nausea, and other symptoms.  (*See, e.g.*, R. 107, 226, 249, 484.)  At one point, she reported that she was taking as many as thirteen different medications.  (R. 467.)  Several doctors suggested that some of her particular problems resulted from adverse reactions to one or more drugs.  (*See, e.g.*, R. 227-28, 232, 489, 493.)  Her records alternate between periods in which she seeks treatment for her back pain and periods in which she seeks treatment for nausea and other symptoms.

### 1. Pre-Disability Application Records

3

*a. 1998 - 2000*

In 1998, Mrs. Franklin complained about abdominal and back pain.  A radiology exam of her pelvic bones, a computed tomography ("CT") scan of her abdomen and an ultrasound failed to reveal major problems.  (R. 274-75, 277.)  Following unsuccessful treatment with anti-inflammatory drugs, Mrs. Franklin underwent laparoscopic surgery at Westview Hospital.  (R. 272-73.)  A surgeon found a "hypermobile" cecum, a pouch at the beginning of the large intestine that can be a source of abdominal pain, and stapled it to her right abdominal wall.  (*Id.*)  Later that year, Mrs. Franklin received epidural steroid injections in her lower spine to relieve back pain.  (R. 268, 270.)  A physical exam revealed evidence of decreased range of motion in both legs.  (*Id.*)

In 1999 and early 2000 Mrs. Franklin was treated for back problems at Atlas Orthopaedics and OrthoIndy and underwent an intradiscal electrothermal annuloplasty ("IDET"), a form of heat treatment of the spine, in June 1999.  (R. 120, 124, 462.)

*b. November 8, 2000 - August 14, 2001*

The next group of records relates to Mrs. Franklin's efforts to obtain treatment for back pain, following a June 2000 car accident.  In what appears to be an initial evaluation, Dr. Steven E. Levine of Renaissance Pain Management & Diagnostics, LLC, described Mrs. Franklin as a patient suffering "from a tremendous amount of lumbar back pain."  (R. 463.)  A diagnostic operation and CT scan revealed damaged discs in her lower back (R. 451-53), and Dr. Levine performed a series of nerve blocks (R. 424, 456, 458), and a form of disc surgery in which he removed disc fragments and treated

the damaged area with heat and laser (R. 165, 432-34, 451-53).  From April 2001

through August 14, 2001, he reported that Mrs. Franklin's back pain was about sixty

percent improved.  (R. 165-66, 263-64, 411, 415, 419-20.)

Mrs. Franklin also participated in aquatic and other physical therapy at Healthplex

Rehabilitation Services.  (R. 179-207.)  Her reported pain level ranged from three to

eight on a ten-point scale.  (*See, e.g.*, R. 182, 184-85.)  On July 16, 2001, the therapist

quoted her as saying, "Was feeling pretty good until I had to mow 2 acres of the lawn

over the weekend. I HAD to do it!"  (R. 187.)  A therapist reported on October 8, 2001,

that Mrs. Franklin had partially met her goals of increased physical activity with less

pain.  (R. 179-80.)

### 2.  Post-Disability Application Records

*a.  July 5, 2002 - October 3, 2002*

Mrs. Franklin sought treatment in July 2002 for right hip pain that she said had

begun three months earlier and gradually increased.  (R. 484.)  Although a radiology

exam was relatively normal, Dr. John Meding of The Center for Hip and Knee Surgery

diagnosed right hip bursitis.  (R. 253, 262.)  Mrs. Franklin received therapy at Healthplex

until July 31, 2002, when she notified the provider by phone that she was unable to

continue.  (R. 265, 474-75.)

On August 6, 2002, she returned to Dr. Levine, now with Midwest Pain Institute,

who performed a joint injection after noting Mrs. Franklin "apparently had an

5

exacerbation in her right lower lumbar spine and right hip after an aggressive physical therapy program." (R. 404.) He also noted that Mrs. Franklin was reporting a "sharp, aching and knife-like pain . . . [and] is unable to walk very well." (*Id.*)

He examined her again on October 3, 2002, and found no swelling or problems with her muscles. (R. 402.) Rotating her back produced mild pain, but her hip exam and straight leg raise were normal. (*Id.*) Mrs. Franklin reported that since her March 2001 discectomy, she had had a deep ache in her lower back (not the knife-like pain described earlier) that had spread into her hips and right thigh. (*Id.*)

*b. December 17, 2002 - February 18, 2003*

In December 2002, Mrs. Franklin complained of nausea and vomiting to Dr. Olga Walton, who noted that prior gastrointestinal studies and gallbladder ultrasound had been done but nonetheless ordered additional testing. (R. 249; 255.) Between December 21, 2002, and February 1, 2003, Mrs. Franklin underwent exams for parasites, upper gastrointestinal and colon studies, chest x-rays, a CT scan of her head, and other exams; all were relatively normal. (R. 222, R. 234-48.) One consulting physician wrote Dr. Walton that he didn't "have a good explanation for any of her symptoms." (R. 235.) Mrs. Franklin said her intestinal problems developed about the end of September 2002, following a cruise to Mexico. (R. 225; 255.)

On February 4, 2003, Mrs. Franklin was admitted to Hendricks Community Hospital for a three-day stay after Dr. Walton detected a rapid pulse rate during an

office visit.  (R. 225.)  Mrs. Franklin had complained that she was having "syncopal" (fainting or loss of consciousness) episodes at night and dizziness.  (R. 220.)

Other physicians examined Mrs. Franklin during her stay and were unable to find a physical cause of her problems.  Her neurological exam was negative.  (*Id.*) Electronic monitoring did not reveal any abnormalities while she was awake or asleep. (R. 220, 335.)  A psychiatrist, Dr. Philip J. Borders, found her to be depressed, stating "Ms. Franklin certainly appears to be a woman whose psychiatric difficulties are contributing to her physical problems."  (R. 229-30.)  Dr. Mark A. Muckway stated that there was "some excessive somatic element" to Mrs. Franklin's symptoms.  (R. 232.) Dr. Walton wondered if Mrs. Franklin had developed a reaction to her medications, and observed, "Overall she is a complicated patient." (R. 227-28.)

Mrs. Franklin was released from the hospital February 4, 2003, but returned to the emergency room 13 days later, complaining of swollen legs, ankles, and feet and an inability to move her toes.  (R. 286.)  A triage note indicated that she had just returned from a trip to a Caribbean island nation north of Venezuela.[2]  The note reads, "pt just got off plane from Aruba – stated noticing swelling in LE's Wednesday – has gotten worse . . . ."  (R. 288.)  Testing did not reveal any serious problems.  (R. 294.)

Between February 18 and June 2, 2003, Mrs. Franklin was seen at various times by Dr. Olga Walton, who noted complaints of worsening lower back pain.  (R. 211-13.)

---

[2]  The note is hand-dated February 16, 2003, but hospital records indicate that Mrs. Franklin was actually admitted February 17, 2003, shortly after midnight.  (R. 288.)

*c. May 6, 2003 - September 9, 2003*

Mrs. Franklin returned to Midwest Pain Institute in May 2003.  A magnetic resonance imaging (MRI) revealed moderate stenosis (narrowing) and degeneration of the lower discs where Mrs. Franklin has had problems.  (R. 399-400.)  Dr. Levine performed additional nerve root blocks (R. 398) and by July 1, 2003, decided to place Mrs. Franklin on methadone.  (R. 394.)  He described Mrs. Franklin's pain as "intractable."  (*Id.*)  Although her ability to bend was limited, straight leg raises and a hip exam were normal.  (*Id.*)  Dr. Levine provided the following assessment:

> She is not doing well on short-term opioids and she has no quality of life. Unfortunately at this point in time, it is my opinion that she is unable to perform any meaningful work or activity secondary to her pain.  She is unable to sit or stand for any period of time in one position.  She feels best lying supine with her knees flexed forward.

(R. 395.)

On August 11, 2003, he stated that  Mrs. Franklin "has failed all conservative, interventional, and adjuvant therapy" to control her pain.  (R. 631.)  In September, a Midwest Pain Institute nurse practitioner increased Mrs. Franklin's medication after she complained that her right hip pain was spreading to her ankles.  (R. 630.)

*d.  October 20, 2003 – December 2003*

8

Mrs. Franklin returned to the hospital for what records indicate was an eight-day stay, October 20 to 27, 2003.  Her husband had found her in a post-vomiting lethargic state.  (R. 513, 602.)  Dr. Walton suspected a reaction to medication.  (R. 513.)  Other doctors were again consulted but tests and examinations revealed no physical problems.  (R. 514, 575, 590, 598.)  Dr. Borders recommended outpatient psychiatric treatment to deal with her depression and psychological factors affecting her physical condition, and subsequently began psychotherapy.  (R. 508-512, 518-19.)  Dr. Walton diagnosed "intractable vomiting, nausea, [and] diarrhea" (R. 593) and agreed to arrange for Mrs. Franklin to be seen at the Mayo Clinic or Indiana University.  (R. 603.)

At the Mayo Clinic in November and possibly December 2003, Mrs. Franklin was evaluated for recurring episodes of nausea, vomiting, diarrhea, and dizziness.  (R. 487-507.)  Numerous tests, including bone, chest, abdomen, and pelvis scans, and a colonoscopy, were performed.  (R. 488.)  According to one physician, the laboratory data was "reassuringly normal."  (R. 490.)  Clinic physicians concluded her symptoms were consistent with irritable bowel syndrome and recommended biofeedback and anti-diarrheal medicine.  (R. 488.)

Mrs. Franklin was evaluated for back pain as well.  (R. 494-96.)  She rated her pain at 8/10 and stated that the pain had become progressively worse and now involved her right leg.  A bone scan showed signs of degenerative uptake in the lower lumbar and cervical spine.  (R. 502.)  The clinic recommended a program of pain rehabilitation. (R. 494, 496.)

9

*e. February 3, 2004 - May 4, 2004*

Mrs. Franklin sought additional testing and treatment for neck, back and abdominal pains during this period.  (R. 543, 628.)  An April 9, 2004, radiology exam found disc disease in two lower back discs (R. 537) while an MRI revealed "[m]oderately severe degenerative disc disease and spondylosis" in two lower back discs and some minor diffuse disc bulging in two lower discs  (R. 534.)  A CT scan of her head was negative.  (R. 535.)  On April 23, 2004, Franklin was evaluated at Midwest Neurology by Dr. James S. Cook, who found that she suffered from "biooccipital neuralgia," a form of persistent pain cause by injury or irritation of nerves in the back of the head, and migraines.  (R. 531.)

 On April 13, 2004, Mrs. Franklin stated that her pain has become intense and Levine recommended "two weeks of aggressive cervical traction along with physical therapy."  (R. 628.)  On May 4, 2004, Levine noted that Mrs. Franklin had elected to get a cervical epidural steroid injection.  (R. 627.)

**C.  Pre-Hearing Agency Evaluations**

Consulting physician Phillip S. Budzenski, M.D., examined Mrs. Franklin on June 19, 2002.  (R. 149.)  Mrs. Franklin walked favoring her right side and carried a cane, although she did not require it to walk.  (R. 150.)  He found that she had some trouble squatting, that her right knee crackled when it moved, and that she had limited motion in part of her spine and right hip.  (R. 152, 155.)  He diagnosed joint disease in her right knee, back pain with right hip pain when in motion, mitral valve prolapse, depression

and "well-controlled gastroesophageal reflux disease."  (R. 153.)  He stated that an inflammation of her sacroiliac joint was probably causing her leg pain.  (*Id.*)

Dr. Budzenski concluded that she would not be able to walk more than fifteen minutes an hour but "should be able to perform seated work without difficulty."  (*Id.*)  Among his other findings: Mrs. Franklin should be able to lift ten pounds continuously, operate a car, and work in a seated position eight hours a day.  (*Id.*)

An agency consultant, J. Pressner, Ph.D., declared in a report dated July 24, 2002, that Mrs. Franklin had a diagnosis of depression that only mildly limited her functioning.  (R. 138, 145.)  An agency physician concurred with this conclusion on January 16, 2003.  (R. 135.)

Agency physician J. Sands, M.D., evaluated Mrs. Franklin's Residual Functional Capacity ("RFC") on July 23, 2002, and found that she could stand or walk about six hours in an eight-hour day and sit for as long as well.  (R. 128.)  She could also lift up to 20 pounds occasionally and, except for climbing ladders or scaffolds, was not limited in her movements.  (R. 127-28.)  Agency physician James Bianchin concurred with this assessment on December 23, 2002.  (R. 134.)

### D.  Hearing Testimony

At the hearing, Mrs. Franklin testified that her ability to walk was limited and that her pain was constant, 24 hours a day, and usually at a level of eight on a ten-point

scale.  (R. 52.)  She said any activity, including walking, made her pain worse, and her only relief came from a combination of medication and lying down.  (*Id.*)  She said she was able to sit up only for ten minutes at a time and stand for only five minutes.  (R. 53.)  She said she did about one-fourth of the cooking, but her husband performed most household chores.  (*Id.*)  Mostly she reclined in a couch or hammock, reading and listening to music.  (*Id.*)

She said that she had "very disruptive" bouts of nausea and diarrhea three or four times a week, and migraine headaches "for quite a few years."  (R. 59-61.)  She said neck pain made it difficult for her to hold her head up, and that Dr. Levine had given her some injections in her neck.  (R. 61.)  She said that she could walk up stairs although it takes her "quite a while," that when shopping, she has to lean on a cart and rest frequently, and that she can't sit long enough to work at a computer.  (R. 62.)

An agency internal medicine physician, Dr. Paul Boyce, testified that irritable bowel syndrome usually has a psychological component, and that the medical record indicated that Mrs. Franklin's gastrointestinal problems, as well as her syncopal episodes, were related to her medications.  (R. 65-67.)  He also testified that Franklin's medical record did not document frequent migraines.  (R. 67.)

An agency orthopedic physician, Dr. Arthur Lorber, testified regarding her back problems after asking Mrs. Franklin if she had made any trips outside of Indiana since 2001 and specifically about her September 2002 cruise to Mexico.  (R. 70-71.)  The exact extent of Dr. Lorber's testimony cannot be determined because the transcript in

12

the record is marred by several passages marked "inaudible."  (*See* R. 73.)  However, Dr. Lorber stated his conclusion that the medical record did not support a listing for disorders of the spine, Social Security Listing § 1.04, or a listing for a major dysfunction of a joint, Listing § 1.02.[3]  (*Id.*)  He did testify, however, that her RFC was limited to sedentary jobs where she would have the option to sit or stand as needed.  (R. 74.)

A vocational expert, Gail Ditmore, testified that no jobs were available in the economy for a person who could only sit, stand, or walk about ten minutes before having to lie down to alleviate pain, which was approximately the limitation that Mrs. Franklin described.  (R. 80.)  She stated that jobs would also not be available if a person could not maintain attention, concentration, or focus for more than forty-five to fifty minutes an hour during the day.  (R. 84-85.)  She also said that bouts of nausea and vomiting could adversely impact the availability of jobs but this would depend on "each independent employer."  (R. 85.)

The ALJ offered two other hypotheticals, one mirroring the agency physician's RFC assessment and one incorporating Dr. Lorber's limitations.  (R. 81-84.)  Ditmore testified jobs were available under either of these scenarios.  (*Id.*)

## II.  STANDARD OF REVIEW

---

[3]  The transcript shows Dr. Lorber as discussing § 10.02, a listing that does not exist. The transcript contains numerous mistakes, such as referring to the "Mayo Clinic" as the "male clinic" and "syncopal" as "sinkable."  Counsel for Mrs. Franklin and the government agreed at oral argument with the court's assessment that Dr. Lorber was discussing whether Mrs. Franklin's impairments met § 1.02, which would be relevant to his discussion of her hip and knee.

In this action, the court reviews the Commissioner's final decision to determine whether it is "both supported by substantial evidence and based on the proper legal criteria." *Briscoe ex. rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quotation and citation omitted).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (internal quotation omitted).  The court considers the evidence that supports as well as the evidence that detracts from the Commissioner's decision. *Briscoe ex. rel. Taylor*, 425 F.3d at 351.  The ALJ must articulate an analysis of the evidence and "build an accurate and logical bridge from the evidence to [the] conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see also Briscoe ex. rel. Taylor*, 425 F.3d at 351 ("ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review.").

Regulations under the Social Security Act provide a five-step process by which to determine whether a person is disabled.  The steps are briefly described as follows. 1) Determine whether the claimant is engaged in a substantial gainful activity.  If so, the claimant is not disabled.  2) Determine whether the claimant's impairment or combination of impairments is "severe."  If not, the claimant is not disabled.  3) Determine whether the claimant's impairment meets or equals one of the impairments in the Listing of Impairments.  If so, then the claimant is disabled.  4) Determine whether the claimant's residual functional capacity ("RFC") prevents the performance of past relevant work.  If the claimant can still do his or her past relevant work, he or she is not disabled.  5) Determine whether the claimant is unable to perform any other work within

14

the economy in light of the claimant's RFC, age, education, and prior work experience. If not, then he or she is disabled.  *See Rice v. Barnhart*, 384 F.3d 363, 365 (7th Cir. 2004); 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the burden of proof at steps one through four; at step five, the Commissioner bears the burden.  *Briscoe ex rel. Taylor*, 425 F.3d at 352.

## III.  DISCUSSION

As the medical history summarized above shows, this appeal concerns a woman who, unwilling or not, has become a full-time patient.  She has been poked, prodded, and scanned numerous times.  Yet, aside from a few tests mostly showing disease and degeneration in her lower back, medical science has revealed her to be functioning relatively normally.

In his extensive decision, the ALJ discussed nearly all of the health issues raised by these records and by Mrs. Franklin.  He found that her intestinal problems, migraine headaches, lapses of alertness or consciousness, and depression were temporary, a reaction to medication, or otherwise lacking evidence of a level of severity that could be considered debilitating.  (*See* R. 26-28, 37-38.)  However, he did find, at step two, that she had severe impairments stemming from her back, hip, and joint problems and her occipital headaches.  (R. 26.)  At step three, on the basis of Dr. Boyce's and Dr. Lorber's testimony, he concluded that these impairments did not meet or equal a Social Security listing.  (R. 26, 28.)

Mrs. Franklin does not disagree.  Rather, she focuses on the ALJ's step four finding that she remains capable of performing "virtually the entire range of sedentary work."  (*See* R. 35.)   Her appeal rests on her contention that her pain has reached such intensity that she is unable to work.  (Pl.'s Br. 4.)  She argues that the ALJ  (a) erred in rejecting the opinion of her treating pain physician, Dr. Levine, (b) misconstrued the record, and (c) employed flawed logic and disregarded evidence in finding her testimony lacking in credibility.  (*Id.* 5-11.)  None of these arguments are persuasive.

### A. Treating Physician

A treating physician's opinion is entitled to controlling weight but only if it is well-supported by clinical and laboratory findings and is not "inconsistent with the other substantial evidence" in the applicant's record.  20 C.F.R. § 404.1527(d)(2); *accord Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).  Even when the opinion is not entitled to controlling weight, the ALJ must still consider it and provide "good reasons" for the weight assigned.  20 C.F.R. § 404.1527(d)(2)-(6).  The treating physician's opinion is never entitled, however, to controlling weight on non-medical issues reserved to the Commissioner, such as whether the applicant is disabled, whether the applicant's impairments meet or equal a listing, the applicant's RFC, and the application of vocational factors to the applicant.  *Id.* § 404.1527(e).

Mrs. Franklin contends that Dr. Levine's opinion of July 1, 2003 was entitled to controlling weight because it was supported by medical findings and was not inconsistent with other substantial evidence.  (Pl.'s Br. 5.)  In that evaluation, Dr. Levine

16

stated that she was unable to work because of her inability to sit or stand for any period of time in one position.  (R. 395.)  This is really two opinions, but neither is entitled to controlling weight.  First, as noted above, her ability to work is a non-medical issue. *See Dixon v Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) (noting that the Commissioner, not a treating physician, decides whether a claimant is disabled).

Second, her ability to sit or stand for any period of time was based on Dr. Levine's subjective assessment of Mrs. Franklin's pain.  While the source of her pain, the deterioration of her lower back discs, was well documented, neither the level of her pain nor her ability to tolerate it were well-supported by clinical and laboratory diagnostic techniques.  Just the opposite.  As the ALJ noted, straight leg raises, an electromyogram, and a nerve conduction velocity test were normal.  (R. 30.)  Dr. Levine's own exams of Mrs. Franklin revealed tenderness and some swelling.  (*See, e.g.*, R. 394.)  However, nothing in his submitted medical records establishes that his pain assessment was based on anything more than Mrs. Franklin's self-reporting.  *See White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (holding that a treating physician's opinion regarding debilitating pain was not entitled to controlling weight when it was based on subjective complaints).

Mrs. Franklin argues that negative straight leg raises and normal exams were not inconsistent with a high level of pain.  Perhaps.  As the Seventh Circuit has observed, pain is always subjective.  *Carradine v. Barnhart*, 360 F. 3d 751, 753 (7th Cir. 2004). However, the two-fold test for a treating physician presumption – requiring medical findings and consistency with other evidence – addresses the concern that while a

17

treating physician would normally be expected to have greater familiarity with the patient, this personal relationship might also be a motive to help the patient obtain a disability. *See Cummins v. Schweiker*, 670 F.2d 81, 84 (7th Cir. 1982) (affirming an ALJ's refusal to defer to a treating physician's assessment of severe intractable pain).

In this case, Dr. Levine's evaluation of July 1, 2003, seems written with Mrs. Franklin's disability application in mind, as it is the only note from him that addresses her ability to work. As the ALJ observed, Mrs. Franklin had told Dr. Levine at another time that her pain had improved. (R. 30.) (The ALJ might also have noted that from April through August of 2001, prior to her disability application, Mrs. Franklin had reported that her back pain was about sixty percent improved.) Mrs. Franklin contends this does not discredit her complaints of pain because her pain relief was only temporary. (Pl.'s Br. 6.) However, these reports are an inconsistency suggesting that Dr. Levine's one-time opinion should not be given controlling weight. The ALJ was not "playing doctor" in commenting on them, as Mrs. Franklin suggests. Nor was he making a diagnosis. He was merely determining whether the record provided the support required for a treating physician's presumption on this issue.

Yet even if the court were to find that the ALJ erred here, the only mistake was in ascribing the wrong reason for not giving Dr. Levine's opinion controlling weight. In the absence of clinical tests supporting her claim of being unable to sit or stand in one position for any substantial period of time, Dr. Levine's opinion did not deserve controlling weight.

18

### B. Misconstrued Evidence

In arguing that the ALJ improperly rejected Dr. Levine's opinion, Mrs. Franklin also asserts that the ALJ made two other errors that demonstrate his failure to comprehend the medical record before him.  First, she asserts that the ALJ, in describing Dr. Levine as a pain specialist who treats symptoms rather than medical conditions, misapprehended Dr. Levine's credentials.  (Pl.'s Br. 6-7.)  Specifically, she argues that because Dr. Levine performed discectomies in March 2001, he "can hardly be said to be merely treating symptoms."  (*Id.* at 7.)

The record does not show that the ALJ was unaware of Dr. Levine's credentials, and indeed Dr. Levine's designated specialty appears to be the treatment of back pain, as shown by his affiliation with Renaissance Pain Management and Midwest Pain Institute.  But perhaps Mrs. Franklin is arguing that the ALJ improperly dismissed Dr. Levine's opinion because of his speciality.  As the Seventh Circuit has observed, "[p]ain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition."  *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996).  Here, the essence of Mrs. Franklin's disability claim was her pain, and the ALJ should not have been dismissive of Dr. Levine's opinions because he was treating pain rather than a condition.  Presumably Dr. Levine would be more experienced at evaluating true pain symptoms from feigned ones.

In this instance, however, the ALJ's somewhat ambiguous comment about Dr. Levine treating symptoms was of limited importance.  Having found that Dr. Levine's

opinion was not entitled to controlling weight, the ALJ was determining how much consideration to give it in determining Mrs. Franklin's RFC.  (*See* R. 34-35.)  The ALJ noted that he had reviewed all of Dr. Levine's records and his July 1, 2003, opinion was the only time that Dr. Levine had commented on Mrs. Franklin's need to alternate between sitting and standing every few minutes.  (R. 35.)  "[T]his limitation sees to be one which Dr. Levine arrived at rather spontaneously and with no reference to any objective findings or even a history of the claimaint's complaints of such a situation existing."  (*Id.* (citation omitted).)  This was a sufficient reason for discounting Dr. Levine's July 1, 2003, opinion.

Secondly, Mrs. Franklin argues that the ALJ demonstrated his failure to comprehend the record when he equated the testimony of Dr. Lorber, the testifying medical expert, with Dr. Levine's.  (Pl.'s Br. 7.)  Specifically, the ALJ commented, "Finally, the opinion of Dr. Lorber is indistinguishable from that of Dr. Levine.  As such, it is not followed for the reasons given that the treating source opinion is not totally adopted."  (R. 33.)

As Mrs. Franklin points out, Dr. Lorber did differ with Dr. Levine, with regard to her RFC.  Dr. Lorber suggested that Mrs. Franklin was able to work a sedentary job so long as she had the option to sit or stand while Dr. Levine's July 1, 2003, opinion stated she could not work at all.  However, the ALJ discussed both recommendations and was obviously aware of the distinctions.  (*See id.*)  In this respect, the ALJ's comment was a poorly-worded attempt to apply his concerns about Dr. Levine's RFC assessment to Dr. Lorber's.  The ALJ had noted earlier that the claimaint's allegations "are significantly out

20

of proportion to the medical evidence, particularly the objective medical evidence discussed above." (*Id.*)  His comment equating Dr. Lorber's opinion to Dr. Levine's is not evidence of a logical flaw or lack of substantial evidence in the record as Mrs. Franklin contends.

### C.  Mrs. Franklin's Credibility

Mrs. Franklin contends that the ALJ did not support his credibility determination with sufficient evidence.  (Pl.'s Br. 9.)  As she correctly notes, once an applicant produces medical evidence of an underlying condition that could be expected to produce a symptom such as pain, the ALJ cannot dismiss the applicant's testimony merely because it is unsupported by objective evidence.  *See Carradine*, 360 F.3d at 753.  However, that is not what the ALJ in this case did.

In evaluating Mrs. Franklin's statements and testimony, the primary issue was "the degree of limitation which is to be reasonably assigned to the claimant's alleged pain, considering all of the factors set forth in Social Security Ruling 96-7p."  (R. 32.) Those factors include the individual's daily activities; the location, duration, frequency, and intensity of the pain; aggravating and precipitating factors; medication; and other treatment for pain relief.  SSR 96-7p.

The ALJ discussed her treatment and therapy.  (R. 29-31.)  He noted that she had reported periods of improvement, including an ability to alleviate her pain with medication, to do some laundry and household cleaning tasks without her pain increasing beyond a level of four on a ten-point scale, and to drive.  (R. 29, 32.)  He

21

noted that she had gone on a cruise to Mexico in 2002.[4]  (R. 32.)  He also noted that she had walked into the hearing room without any assistive device and sat throughout the hearing without "any outward signs of pain or discomfort, such as halting speech; grimacing, sighing; or any other indication that could reasonably be construed as resulting from pain or discomfort."  (*Id.*)

Mrs. Franklin objects to the ALJ citing her 2002 cruise as an activity that was inconsistent with her alleged level of pain.  She argues that the record shows that she and her husband purchased a custom van that allows her to lie down when traveling; and that "lounging and relaxation can be had on every deck" of a cruise ship.  (Pl.'s Br. at 9.)  The record, however, does not reflect how she traveled to get on the cruise ship or her activities once on board.  Even without this information, though, her willingness and ability to undertake such a trip was probative of her claim to being unable to sit or stand in one position for long.

The central issue in this case was, as the ALJ acknowledged, whether Mrs. Franklin's pain was disabling.  When a disability applicant presents a record as substantial as Mrs. Franklin's with few physical abnormalities, an ALJ might wonder if the applicant was (a) a person truly disabled by pain but unable to pinpoint or remedy the source, (b) a person seeking the attention and sympathy of those around her, or (c) a person fabricating a record of a disability.  The first person would be entitled to an

---

[4]  The ALJ stated that this occurred in December 2002, as indicated by the hearing transcript (*see* R. 32, 70-71), although the medical records are consistent that she made the trip in September 2002, during a period in which she was seeking relief for her back pain (*see* R. 225, 255, 630).

award, and so might the second, if, for example, the attention-seeking stemmed from a mental illness that induced somatic pain.  *See Carradine*, 360 F.3d at 754.  The third person would not.

Here the questioning at the hearing could have been more probing.  The ALJ might have asked, for example, whether Mrs. Franklin regularly mowed two acres, as she did in July 2001 when she was undergoing therapy for pain rehabilitation; why she described her pain to Dr. Levine as knife-like in August 2002 but a dull ache two months later; or if she indeed traveled to Aruba following her February 2003 hospitalization.  But the absence of questions or discussion on these points is not fatal.  The ALJ considered the major evidence favorable to Mrs. Franklin.  He discussed his reasons for rejecting Dr. Levine's July 1, 2003, opinion, and for finding Mrs. Franklin not to be credible regarding the limiting effects of her pain.  In short, he built a logical and credible bridge connecting the evidence with his conclusion.  The court will not reweigh the evidence.

## IV.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision will be **AFFIRMED**. A separate judgment will be entered.

ALL OF WHICH IS ENTERED this 14th day of February 2007.

John Daniel Tinder, Judge
United States District Court

23

Copies to:

Thomas E. Kieper
United States Attorney's Office
tom.kieper@usdoj.gov

Charles D. Hankey
charleshankey@hankeylawoffice.com